21-MJ-2539-MBB
21-MJ-2540-MBB

### AFFIDAVIT IN SUPPORT OF
### APPLICATION FOR TWO SEARCH WARRANTS

I, Michael A. Logan, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Police Officer with the North Andover Police Department and have been so employed since February 2015.  I am currently assigned as a Task Force Officer ("TFO") to the Drug Enforcement Administration Cross Border Initiative ("DEA/CBI") and have been so employed since July 2018. As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws set forth in Title 21 of the United States Code. I am a "federal law enforcement officer" as defined by Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request criminal complaints and arrest and search warrants.

2.      I have received training in the investigation of controlled substances from the Methuen Police Academy at Northern Essex Community College in Haverhill, Massachusetts and completed the DEA Basic Narcotics School.  I have also received annual training at the North Andover Police Department in-service program.  I have been involved in numerous drug arrests and investigations of drug trafficking organizations.  These investigations involved, but were not limited to, the following controlled substances: heroin, fentanyl, cocaine, and cocaine base. During these drug investigations, I have observed hand-to-hand drug transactions and numerous controlled substances, and I am familiar with the ways illicit substances are packaged for distribution.  I have coordinated controlled purchases of illegal drugs using confidential sources, cooperating witnesses, and undercover officers.

1

21-MJ-2539-MBB
21-MJ-2540-MBB

3.      In the course of my official duties as a police officer and TFO, I have interviewed many defendants, informants, and suspects who were users, sellers, and distributors of controlled substances.  On the basis of my training and experience, I am familiar with the vernacular used by illegal drug users and distributors.  I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations. I am familiar with the full range of methods, practices, and techniques by which members of organized conspiracies illicitly transport, distribute, store and import controlled substances. I am also familiar with the various paraphernalia used to manufacture, process, deliver, dispense, import, export, and use controlled substances.

4.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.  However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information.  I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection and that they often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

2

21-MJ-2539-MBB
21-MJ-2540-MBB

## PURPOSE OF AFFIDAVIT

5.     I submit this affidavit in support of an application for search warrants for the electronic equipment seized from Nino De Leon Guzman, a/k/a "Chino" ("DE LEON GUZMAN" or "Target Subject") pursuant to his arrest on June 23, 2021:

> a.   A black Motorola Tracfone, Model: XT2005DL, FCC ID: IHDT56YA2, IMEI: 352180104100304, TRACK ID: ZY327HWTTN, assigned call number (978) 390-8301 ("Target Device 1"); and
>
> b.   One black Apple iPhone (in a case) ("Target Device 2")

(the "Equipment" or the "Target Devices"), that are in the possession of law enforcement officials as described in Attachments A-1 and A-2, respectively. There is probable cause to believe that the Target Devices contain evidence, fruits, and instrumentalities of the Target Offenses listed below, as described in Attachment B.

6.     I am currently participating in an investigation into the criminal activity of DE LEON GUZMAN and others yet unknown as outlined in this affidavit.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.

7.     For the reasons set forth herein, there is probable cause to believe that DE LEON GUZMAN has committed violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 846 (conspiracy to possess with intent to distribute controlled substances) (hereinafter, the "Target Offenses").

3

8.      This Affidavit is submitted for the limited purpose of establishing probable cause to believe that evidence of criminal activity will be located on the Target Devices. Accordingly, I have not included all facts known to me and other law enforcement officers involved in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause. All times herein are approximate.

## PROBABLE CAUSE

9.      On June 17, 2021, this Court issued an arrest warrant and criminal complaint for DE LEON GUZMAN for conspiracy to distribute and possess with intent to distribute 40 grams or more of a mixture and substance containing fentanyl, in violation of Title 21, United States Code, Section 846. *See* 21-MJ-2501-MBB (under seal). I submitted an affidavit in support of that warrant and complaint (hereinafter, the "Complaint Affidavit"), which is attached hereto as Exhibit 1 and incorporated by reference herein.

10.      On June 23, 2021, DE LEON GUZMAN was arrested on the criminal complaint. At the time of his arrest, DE LEON GUZMAN had the Target Devices on his person. At the time of his arrest, DE LEON GUZMAN also had on his person multiple plastic bags of suspected fentanyl, some of which were in the form of compressed powder with blue Xs on the plastic bags. Based upon my training, experience and knowledge of the investigation, I believe the suspected fentanyl was packaged for distribution.

11.      Also, on June 23, 2021, this Court issued a search warrant for 6 Quincy Street, back basement unit, Methuen, Massachusetts 01844. *See* 21-MJ-2507-MBB (under seal). I submitted an affidavit in support of that warrant (hereinafter, the "6 Quincy Street Affidavit"), which is attached hereto as Exhibit 2 and incorporated herein by reference.  During the course of the

4

execution of the search warrant, agents located, among other things, multiple bags of suspected fentanyl, a kilogram that field tested positive for fentanyl, a ledger, a scale, a cell phone,[1] drug packaging materials, and approximately $2,500 in cash. Some of the bags of suspected fentanyl also had blue Xs on the plastic bags, like the bags seized from DE LEON GUZMAN at the time of his arrest. I believe the items seized during the search warrant execution are consistent with the distribution of narcotics.

12.     On July 22, 2021, a federal grand jury sitting in Boston returned an indictment charging DE LEON GUZMAN with: conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. § 846 (Count One); Distribution of 40 Grams or More of Fentanyl, in violation of 18 U.S.C. §§ 841(a)(1) & (b)(1)(B)(vi) (Counts Two and Three); Distribution of Fentanyl, in violation of 18 U.S.C. § 841 (Count Four); and Possession with Intent to Distribute 400 Grams or More of Fentanyl, in violation of 18 U.S.C. §§ 841(a)(1) & (b)(1)(A)(vi).

13.     As set forth in the Complaint Affidavit, beginning in or about October 2020, DE LEON GUZMAN served as a runner for a drug trafficking organization ("DTO") that sold large quantities of fentanyl in the Lawrence, Massachusetts area. Agents believed the leader of this DTO was an individual known only as "Marco" (hereinafter, "MARCO") who utilized telephone number of (978) 242-6781 (hereinafter, the "6781 Number"). During the investigation, members of the DEA utilized three different undercover officers to make purchases of fentanyl on nine

---

[1] This cell phone is being forensically examined, and the results of the forensic examination are still pending.

different occasions from the MARCO DTO.

14.     In October and November 2020, the first undercover officer ("UC-1") conducted a total of four undercover purchases of suspected fentanyl from the MARCO DTO.   These undercover purchases all took place in a similar fashion. In connection with each, UC-1 communicated with the 6781 Number via text message to make arrangements to purchase fentanyl. On all four dates, UC-1 and the user of the 6781 Number agreed on a quantity and price for the fentanyl, and the MARCO DTO directed UC-1 to meet in the area of 36 Farnham Street in Lawrence, where the same runner met with UC-1 to deliver the suspected fentanyl. This runner was later identified as DE LEON GUZMAN and the details of this identification are set forth in the Complaint Affidavit. *See Complaint Affidavit* ¶ 26. The suspected fentanyl was sent to the DEA Laboratory for testing, and the results confirmed the substance for each contained fentanyl. These undercover purchases are set forth in more detail in the Complaint Affidavit.

15.     On December 4, 2020, UC-1 sent a text message to the 6781 Number to place an order for 100 grams of fentanyl. Once UC-1 arrived at the same meeting location, UC-1 sent a text message to the 6781 Number to alert the MARCO DTO of UC-1's arrival. Agents conducting surveillance observed a male, believed to be DE LEON GUZMAN, arrive in a taxi and go into a residence at 95 Farnham Street. After waiting for approximately fifteen minutes, UC-1 sent a text message to the 6781 Number.  The MARCO DTO responded that they believed they observed an unmarked police unit in the area.  Shortly thereafter, agents observed an unidentified female exit a residence at 172 Parker Street, get into a vehicle, and drive around the block in a slow and deliberate manner, as if performing counter-surveillance. UC-1 again attempted to communicate with the 6781 Number but did not receive a response.  Based on my training and experience, I

believe the MARCO DTO stopped using the 6781 Number after members of the MARCO DTO recognized law enforcement conducting surveillance in the area.

16.     As set forth in the Complaint Affidavit, in February 2021, agents learned of an additional phone number that a DTO based in Lawrence used to arrange drug transactions. *See Complaint Affidavit* ¶¶ 16-19.  That phone number was (857) 207-9113 (hereinafter, the "9113 Number"). An intelligence analyst with the DEA analyzed telephone records for the 6781 Number and the 9113 Number. From that analysis, agents linked the two telephone numbers as both being used by the MARCO DTO, and that the 9113 Number was used by someone other than the user of the 6781 Number.

17.     Specifically, for the first three undercover purchases with UC-1, immediately after UC-1 sent a text message to the 6781 Number to advise the MARCO DTO of UC-1's arrival, the user of the 6781 Number made an outgoing call (or calls) to the 9113 Number, and shortly thereafter, DE LEON GUZMAN delivered fentanyl to UC-1.  For the undercover purchase that took place on November 24, 2020, DE LEON GUZMAN delivered the fentanyl to UC-1 minutes after UC-1 notified the user of the 6781 Number that UC-1 had arrived.  During that undercover purchase, UC-1 arranged to purchase 40 grams of fentanyl from DE LEON GUZMAN, but when DE LEON GUZMAN arrived at the meet location, UC-1 told DE LEON GUZMAN that UC-1 actually wanted 60 grams. DE LEON GUZMAN responded, "four," then stepped away from the undercover vehicle and walked towards Parker Street.  Minutes later, DE LEON GUZMAN returned to the undercover vehicle, got into the front passenger seat, and told UC-1 that he only had 40 grams.  UC-1 then placed a call to the 6781 Number in the presence of DE LEON GUZMAN and spoke with an unidentified male. The user of the 6781 Number told UC-1 they

could supply UC-1 with an additional 20 grams in one hour.  UC-1 then made the purchase of the 40 grams of fentanyl from DE LEON GUZMAN. During the course of the transaction, DE LEON GUZMAN received a phone call.  Telephone records for the 6781 Number indicate that the user placed a call to the 9113 Number while DE LEON GUZMAN was in the undercover vehicle.

18.     During the course of the investigation and as set forth below and in the Complaint Affidavit, agents learned that DE LEON GUZMAN was the user of the 9113 Number. *See Complaint Affidavit* ¶¶ 16-19 and 26.

19.     Subsequently, on February 17 and 25 and March 25, 2021, a second undercover agent (hereinafter, "UC-2") made three separate undercover purchases from the MARCO DTO. For each, UC-2 communicated with the user of the 9113 Number to arrange the transactions. The fentanyl sold to UC-2 was packaged similarly to the fentanyl from the prior undercover purchases from the MARCO DTO. Agents sent the suspected fentanyl from each of the undercover purchases to the DEA Northeast Laboratory for testing and analysis.  The results for all three confirmed the substances contained fentanyl. Additional details for each transaction are set forth in the Complaint Affidavit. *See Complaint Affidavit* ¶¶ 20-25.

20.     On April 30, 2021, agents used precise location information for the 9113 Number to locate the user of the phone in the area of Saratoga Street in Lawrence.  In so doing, law enforcement approached DE LEON GUZMAN, who produced a Dominican Republic cedula bearing his name and photograph. At that time, DE LEON GUZMAN provided law enforcement with an address of 6 Quincy Street in Methuen, Massachusetts, and a phone number of (857) 204-3920.

21.     Based upon the precise location information and subsequent encounter with DE

LEON GUZMAN, agents believed DE LEON GUZMAN was the user of the 9113 Number. *See Complaint Affidavit* ¶ 26.

22.     In May 2021, UC-2 sent a text message to DE LEON GUZMAN at the 9113 Number to introduce another agent acting in an undercover capacity (hereinafter, "UC-3") as a new customer. On May 10 and May 25, 2021, UC-3 made undercover purchases of approximately 20 grams each of suspected fentanyl from DE LEON GUZMAN. For each of those undercover purchases, UC-3 communicated with DE LEON GUZMAN to arrange the transactions, specifically, UC-3 contacted the 9113 Number to arrange for the purchases. Additional details of these transactions are set forth in the Complaint Affidavit. *See Complaint Affidavit* ¶¶ 27-32.

23.     Precise location information for the 9113 Number for May 10 and May 25, 2021 was consistent with DE LEON GUZMAN being the user of the 9113 Number during both transactions with UC-3.

24.     On June 1, 2021, UC-3 sent a text message to DE LEON GUZMAN at the 9113 Number asking, "You around later this week?" On June 3, 2021, at around 12:31 a.m., UC-3 received a text back from DE LEON GUZMAN stating, "New 9783908301" (which is the number for Target Device 1).  UC-3 believed that DE LEON GUZMAN provided UC-3 with the number for Target Device 1 because it was DE LEON GUZMAN's new phone.. On June 3, 2021 at around 8:45 a.m., UC-3 sent a text message to Target Device 1, identifying himself and requesting to meet the following week.  UC-3 received a text message back from Target Device 1 stating, "Ok."

25.     On June 21, 2021, UC-3 contacted Target Device 1 and placed an order for fentanyl from DE LEON GUZMAN.

26.     As detailed above, agents seized the Target Devices from DE LEON GUZMAN's

person when he was arrested on June 23, 2021. Shortly thereafter, I placed a call to Target Device

1 after it was seized from DE LEON GUZMAN and it rang.

27.     Because DE LEON GUZMAN had both Target Devices and multiple bags of

suspected fentanyl packaged for distribution on his person at the time of his arrest, I believe that

DE LEON GUZMAN used the Target Devices in furtherance of the Target Offenses and that

evidence, fruits and instrumentalities of the Target Offenses will be found on the Target Devices.

DRUG TRAFFICKERS' USE OF CELLULAR TELEPHONES

28.     Based on my training and experience, I know that a cellular telephone is a handheld

wireless device used primarily for voice communication through radio signals. Cellular telephones

send signals through networks of transmitter/receivers called "cells," enabling communication

with other wireless telephones or traditional "land line" telephones. A wireless telephone usually

contains a "call log," which records the telephone number, date, and time of calls made to and

from the phone. In addition to enabling voice communications, wireless telephones now offer a

broad range of capabilities. These capabilities include, but are not limited to: storing names and

phone numbers in electronic "address books;" sending, receiving, and storing text messages and

email; taking, sending, receiving, and storing still photographs and moving video; storing and

playing back audio files; storing dates, appointments, and other information on personal calendars;

and accessing and downloading information from the Internet. Wireless telephones may also

include GPS technology for determining the location of the device. Based on my training,

experience, and research, I know that the Target Devices have some or all of the capabilities

described above. In my training and experience, examining data stored on devices of this type can

show, among other things, evidence that reveals or suggests who possessed or used the device, as well as his criminal accomplices.

29.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

30.     Based upon my training and experience and that of other investigators with whom I have worked and spoken, I know that:

    a.   It is common for persons involved in drug trafficking to maintain – in paper or electronic form – records of the their activities, such as ledgers, bank account records, contact information for co-conspirators, calculations of drug proceeds, books, records, receipts, notes, emails, airline tickets, receipts relating to the shipping, transportation, ordering, sale and distribution of controlled substances, and receipts relating to the purchase of financial instruments and/or the shipping or transfer of funds.

    b.   It is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, transferring, concealing and/or expending narcotics proceeds, such as:  currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money

orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, and documents evidencing travel. These items are maintained by narcotics traffickers in paper or electronic format, and may be found within their cell phones, computers, thumb drives, cameras, other electronic devices and storage media, in secure locations such as their homes, offices, businesses, automobiles, "stash houses," storage places, and/or other locations over which they maintain dominion and control;

c.   Narcotics traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, telephone numbers, email addresses, Skype names/numbers, web addresses, and/or instant messaging account names of their associates in the trafficking organization. It is common for persons involved in drug trafficking to store these books or records where they have ready access to them, including their homes, offices, businesses, automobiles, "stash houses," storage places, and/or other locations over which they maintain dominion and control, and to maintain these records or documents in electronic format in their cellular telephones, computers, thumb drives, cameras, and other electronic devices and storage media;

d.   Drug traffickers commonly profit and amass proceeds from the sale of drugs, and they usually receive U.S. currency as proceeds from the sale of drugs. When drug traffickers amass significant proceeds from the sale of drugs, they attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Traffickers often commingle narcotics proceeds with money generated by legitimate businesses;

e.   These money laundering activities produce and require financial and other records indicative of such activities, as well as records relating to the acquisition and disposition of illegal proceeds. Such records are commonly maintained where the traffickers have ready access to them, including but not limited to their homes, offices, businesses, automobiles, "stash houses," storage places, and/or other locations over which they maintain dominion and control. Further, narcotics traffickers often utilize electronic equipment such as computers, personal digital assistants, cellular telephones, Blackberry devices, tablets, e-mail devices, portable memory, currency counting machines, and telephone answering machines to generate, transfer, count, record, and/or store such information;

f.   Narcotics traffickers frequently take (or cause to be taken) and keep photographs and videos of themselves, their associates, and their property, and usually maintain these photographs and videos in their possession or on devices or media over which

they maintain dominion and control, such as their cellular telephones, cameras, computers, thumb drives, personal digital assistants, Blackberry devices, tablets, e-mail devices, portable memory, and other electronic devices and storage media, in secure locations such as their homes, offices, businesses, automobiles, "stash houses," storage places, and/or other locations over which they maintain dominion and control;

g.  More and more commonly, narcotics traffickers are using "calendar" programs and other features on their cellular telephones to store dates, appointments, and other information related to the receipt and/or distribution of controlled substances, the receipt and/or movement of money related to the distribution of controlled substances, and other matters related to their narcotics trafficking and money laundering activities. They are also more and more frequently utilizing "smart" phone technology on their cellular telephones to access web sites and/or to communicate via the Internet in order to conduct their narcotics trafficking and money laundering activities. Evidence of these activities may be stored in the traffickers' cellular telephone; and

h.  More and more commonly, narcotics traffickers who utilize "smart" phone technology utilize their phones' GPS capabilities to find addresses and other locations where they acquire, store, and/or sell narcotics, and/or collect, count, store, package, or ship money generated from the sale of narcotics. They also frequently utilize their phones' GPS capabilities to enable others to locate them, such as taxis, Uber, and other ride sharing services, which they may utilize in place of their personal vehicles in an effort to avoid law enforcement surveillance. Evidence of the locations utilized by narcotics traffickers can constitute or lead to evidence of drug trafficking, including identification of "stash" locations, confirmation of the meaning of intercepted wire or electronic communications, identification of co-conspirators, identification of the methods and routes used by the narcotics traffickers to obtain and sell narcotics and to transfer, ship, or conceal money made from the sale of narcotics, and other matters. Evidence of these activities and the locations to which the trafficker's cellular telephone has traveled may be stored in the trafficker's cellular telephone.

31.  Based on my training and experience, many different types of records are kept on telephones by narcotics traffickers including the following, for which we seek authorization to search the Target Devices:

a.  Records of personal or business activities relating to the operation or ownership of the phones (such as user names, passwords, telephone records, notes, books, diaries, and reference materials).

b.  Records pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media.

c.  Records relating to time and place of drug meets, deliveries, and transfers.

d.  Records relating to drugs, drug proceeds, drug distribution, drug importation, money laundering, money transfers, ledgers, contact lists, price sheets, and related documents.

e.  Records and information identifying contact information for co-conspirators, sources of supply, customers, and communications made in furtherance of the conspiracy, and photographs and videos of co-conspirators, drugs, drug proceeds, and property related to drug business.

f.  Records and information regarding GPS locations of the phones.

32.     Evidence of drug crimes often is found in cell phones and smart phones used by drug traffickers. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

33.     With the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones. Moreover, the particular numbers of and dialed by particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm relationships among and between co-conspirators, as well as the occurrence of certain events.

34.     As with most electronic/digital technology items, communications made from an

electronic device, such as a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a cell phone, used such a device.

 35. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to

retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

36.     As such, based upon my training and experience and the evidence recovered during the execution of the search warrant at DE LEON GUZMAN's residence, I believe that communications, documents, records, emails, voice mail messages, videos, photographs, call logs, text/SMS messages and logs, GPS location data, and other evidence of the commission of the Target Offenses by DE LEON GUZMAN and others will be found on the Target Devices.

37.     The Target Devices are currently being stored by investigators at their facilities as described in Attachments A1 and A2. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when it first came into the investigators' possession.

//

//

//

//

//

//

//

//

//

16

21-MJ-2539-MBB
21-MJ-2540-MBB

## **CONCLUSION**

38.     Based upon the foregoing, as well as my training and experience, I submit that there is probable cause to believe that the Target Devices, as described in Attachments A-1 and A-2, presently contain the items set forth in Attachment B and that those items constitute evidence of the commission of criminal offenses, contraband, fruits of crime, things otherwise criminally possessed, and property designed or intended for or which has been used as a means of committing the Target Offenses. Accordingly, I respectfully request this Court issue the search warrants for the Target Devices for the items detailed in Attachment B.

Signed under the pains and penalties of perjury.

Respectfully Submitted,

_____
MICHAEL LOGAN
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

ATTESTED and SWORN to before me telephonically in accordance with the requirements of Fed. R. Crim. P. 4.1 on July __29__, 2021.



HON. MARIANNE B. BOWLER
United States Magistrate Judge

17

21-MJ-2539-MBB
21-MJ-2540-MBB

**ATTACHMENT A-1**

Description of the Property To Be Searched

A black Motorola Tracfone, Model: XT2005DL, FCC ID: IHDT56YA2, IMEI: 352180104100304, TRACK ID: ZY327HWTTN, assigned call number (978) 390-8301 seized from the person of Nino De Leon Guzman in Methuen, Massachusetts on June 23, 2021 ("Target Device 1"), presently in the possession of the Drug Enforcement Administration, New England Field Division Cross Border Initiative office in North Andover, Massachusetts in a secure storage area.

21-MJ-2539-MBB
21-MJ-2540-MBB

## **ATTACHMENT A-2**

Description of the Property To Be Searched

A black iPhone in a case seized from the person of Nino De Leon Guzman in Methuen, Massachusetts on June 23, 2021 ("Target Device 2"), presently in the possession of the Drug Enforcement Administration, New England Field Division Cross Border Initiative office in North Andover, Massachusetts in a secure storage area.

21-MJ-2539-MBB
21-MJ-2540-MBB

## **ATTACHMENT B**

### Items to be Seized from the Target Telephones

All records and data from January 1, 2020, in any format whatsoever (digital, electronic, or otherwise) that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance), and 21 U.S.C. § 846 (drug conspiracy), (the "Target Offenses") including, without limitation:

a. Cellular telephones, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referring individuals engaged in drug trafficking and the Target Offenses located in the equipment of the Target Devices;

b. Names and contact information that have been programmed into the Equipment (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

c. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the Equipment;

d. Text messages both sent to and received from the Equipment (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

e. Incoming and outgoing voice mail messages both to and from the Equipment relating to or referencing drug trafficking or individuals engaged in drug trafficking;

f. GPS data;

g. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the Equipment (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

i. All data within the Equipment evidencing ownership, possession, custody, control, or use of the Equipment; and

j. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

20

21-MJ-2539-MBB
21-MJ-2540-MBB

## DEFINITIONS

For purposes of this warrant:

A. "Equipment" means any hardware, software, storage media and data

B. "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device), any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem cable and any connections) and any security device, (such as electronic data security hardware and physical locks and keys).

C. "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file, an encryption code; a user name, or a password) whether stored deliberately, inadvertently or automatically.

D. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive or memory card)

E. "Data" means all information stored on storage of any form in any storage format and for any purpose.

F. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

### Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does

21

not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the Equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If the Equipment cannot be returned, agents will make available to the Equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband, passwords, account information, personally identifying information of victims or the fruits or instrumentalities of crime.